MATTER OF L—Y—Y—

In DEPORTATION Proceedings

A-7139375

*Decided by the Attorney General September 12, 1960*

**Parole—Section 212(d)(5)—Termination does not change status as applicant for admission.**

Termination of parole requires that alien's case be continued in exclusion proceedings; it does not allow conversion into deportation proceedings.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry as an alien not in possession of the visa required by section 13(a) of the Immigration Act of 1924 [8 U.S.C. 213(a)].

BEFORE THE BOARD
(Jan. 25, 1960)

**DISCUSSION:** The Board has ruled that the Service can terminate the parole of an excluded alien and then dispose of the case in expulsion (deportation) proceedings. The Service believes that it has authority to deal with such an alien only in exclusion proceedings, and asks that the issue be referred to the Attorney General for review.

Respondent, a 28-year-old male, a native and citizen of China, sought to enter as a citizen on December 20, 1948. He was paroled pending a decision in his case. In June 1949, he was ordered excluded. Appeal to the Board was dismissed in November 1949. In December 1957, the District Director terminated parole, *nunc pro tunc*, as of December 20, 1948. This was apparently done in order that the respondent could be considered a resident of the United States so that he could make an application for suspension of deportation. In any event, an application for suspension of deportation under the Immigration and Nationality Act of 1952 was submitted on December 23, 1957.

In July 1958, expulsion proceedings were started. In August the respondent filed a motion for reopening of the exclusion proceedings for the consideration of new evidence. The motion was denied by the Board in October on the ground that any evidence which respondent might desire to submit could be presented during the expulsion proceedings. The file fails to reflect that the Service

70

representative at the Board made known any position on the motion. No opposition to the Board order was received.

In January 1959, hearings were held in the expulsion proceedings. In April the special inquiry officer found the respondent deportable on the charge stated above. Respondent's application for suspension of deportation was denied because he had failed to establish existence of the requisite hardship, and because favorable discretionary action was not merited.

Appeal was taken to the Board. On September 8, 1959, the Board dismissed the appeal. The Board found that the alien was deportable and that he had failed to establish eligibility for suspension of deportation. At oral argument, the Service representative had asked that the proceedings be terminated on the ground that there was no authority to try the case in expulsion proceedings. He argued that a person *paroled* into the United States cannot be regarded as if he were "in" the United States and, therefore, could not be proceeded against in expulsion proceedings—used only against a person "in" the United States. The Service representative is of the belief that termination of parole places the respondent in the position of an applicant for admission. (He believes that the respondent is inadmissible to the United States.) Counsel for respondent stated he had submitted a motion to reopen the exclusion proceedings but had been informed by Service officials that after the revocation of parole the case could be heard only in expulsion proceedings.

Parole—the enlargement of the confinement of an excluded alien—was used in the early 1920's, and probably before. Prior to the Immigration and Nationality Act of 1952 there was no specific authority to release an excluded alien on parole. However, the practice existed, for the need was there, and authority could be found in the fact that the Attorney General had the power of staying the immediate deportation of an excluded alien. A feature of parole was the fact that the actual physical presence of the parolee did not in the eyes of the law put him "in" the United States. The parolee was considered as "knocking at the gates." Therefore, one who had been paroled following an exclusion order could not file an application for those adjustments of status which required him to be "in" the United States (*Matter of E—*, 3—541).

In the ordinary case, the parolee was taken into custody and deported on the basis of the order of exclusion after the purpose for which he had been paroled had been served. However, with the approval of the Attorney General, a long-standing practice existed which did permit a paroled alien to be "in" the United States. In comparatively few cases, excludable aliens with close family ties were paroled so that they could adjust their immigration status by applying for voluntary departure and preexamination, or registry,

suspension of deportation, or naturalization. To be eligible for any of these reliefs the alien had to be "in" the United States. In other cases, the administrative authorities desired to put the alien "in" the Untied States so that they could take advantage of laws relating to the expulsion of aliens. These laws permitted a wider latitude in the choice of countries to which an alien could be deported. To put the parolee "in" the United States, the administrative authorities terminated parole and abandoned the order of exclusion. The alien was then considered to be "in" the United States, although in illegal status. The alien could apply for any of the adjustments of status for which he deemed himself eligible, and he could be proceeded against in expulsion proceedings. Thus, prior to the Immigration and Nationality Act, it was established that *in the discretion of the authorities* an alien on parole could be considered as "in" the United States. Prior to the Immigration and Nationality Act, the procedure followed in the instant case would not have been questioned (see, *United States ex rel. Milanovic* v. *Murff*, 253 F.2d 941, 943 (C.A. 2, 1958); *Matter of W—*, 1—558, 562; *Matter of G—*, 1—217; *Matter of R—*, 1—389, 393; *Matter of R—*, 3—45; *Matter of F—*, 2—709; *Matter of L—W—Y*, Int. Dec. No. 242, Acting Attorney General, March 23, 1951).

Respondent's parole was terminated, *nunc pro tunc*, to a time when there was no dispute that administrative authorities could terminate parole to put an alien "in" the United States. It would seem, therefore, that there should be no issue as to whether respondent is "in" the United States and as to whether expulsion proceedings were proper. However, the Service view is broad and would deprive the Attorney General of an important discretionary right. We believe it is necessary to discuss it fully.

We come now to the Immigration and Nationality Act of 1952. Bills which subsequently became the Immigration and Nationality Act gave the Attorney General discretion to parole an inadmissible alien for the purpose of receiving medical treatment. The Department suggested the use of the language which is now found in section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), and in doing this indicated that the intent was to give "statutory force and effect" to the existing administrative "practice" (Revision of Immigration, Naturalization, and Nationality Laws, Joint Hearings Before the Subcommittees of the Committee on the Judiciary, 82d Cong., 1st Sess., on S. 716, H.R. 2379, and H.R. 2816, p. 713; S.R. 1137, 82d Cong., 2d Sess., pp. 12–13). After the passage of the Immigration and Nationality Act of 1952 the practice of terminating parole and proceeding as if the alien were "in" the United States continued. A question as to the validity of

this practice was raised in 1956 in unreported *Matter of P—*, A-5452888 (October 18, 1956).[1] The Board affirmed the validity of the practice. No further action was taken by the Service for some time. On January 8, 1958, the Service amended the regulation concerning parole to provide that upon termination of parole "further inspection or hearing shall be conducted under section 235 or 236 of the act and this chapter, or any order of exclusion and deportation previously entered shall be executed" (8 CFR 212.5, 23 F.R. 142, January 8, 1959).

On June 16, 1958, the Supreme Court decided the case of *Leng May Ma v. Barber*, 357 U.S. 185 (1958). The Service argues that the case requires that termination of parole be followed by the return of the alien to the jurisdiction of an exclusion proceeding.

In *Leng May Ma v. Barber, supra*, the court held that a parolee (physically present in the United States) was not "within the United States" for immigration purposes. We think that *Leng May Ma* says no more than that the Immigration and Nationality Act has not changed the previous law regarding parole. Leng May Ma was excluded and paroled in August 1952 pending final decision in her case. Her appeal was dismissed in December 1953. She was notified to surrender for deportation to China in January 1954. She then applied for a stay of deportation under section 243(h) of the Immigration and Nationality Act (8 U.S.C. 1253(h)) alleging that deportation would subject her to physical persecution. This law had been held inapplicable to an alien in exclusion proceedings for it required an alien to be "within the United States." Leng May Ma

---

[1] The case concerned an alien who had been paroled in 1954 for prosecution; parole was later terminated and expulsion proceedings were instituted. The special inquiry officer found the alien subject to deportation. No issue was raised as to the nature of the hearing. On appeal, the Board reopened the case to enable the alien to be adequately represented by counsel. At the reopened hearing, the special inquiry officer terminated proceedings on the ground that the alien's status could be determined only in exclusion proceedings. The special inquiry officer certified his decision to the Board. Interestingly enough, when the case came before the Board on certification, the Service representative opposed the position of the special inquiry officer. He argued that expulsion proceedings *were* proper and asked that the case be returned to the special inquiry officer for consideration on the merits. The Board saw no reason to depart from the practice which had existed for so long a period and remanded the case to the special inquiry officer for hearing on the merits in the expulsion proceedings. Shortly thereafter, the Service reversed its position and filed a motion asking that the case be terminated because the issue of the alien's immigration status could be determined only in exclusion proceedings. It was argued that both the law and regulation required such a conclusion. On October 18, 1956, the Board entered an order denying the service motion on the ground that section 212(d)(5) of the Immigration and Nationality Act, considered in the light of administrative practice and legislative history, revealed no intention to curb the administrative practice.

argued that having been paroled, she was physically "within" the United States and therefore as a matter of right was eligible for the relief. The court ruled that the alien was not "within the United States" and was not eligible for the relief. The court stated that prior to the Immigration and Nationality Act, (1) the detention of an alien in custody pending determination of his admissibility did not legally constitute an entry although the alien was physically within the United States, and (2) that an alien on parole was "still in theory of law at the boundary line." The court found no evidence that the Congress, in enacting section 243(h) of the 1952 Act, intended to depart from previous interpretations. In reaching its conclusion, the court relied upon the cases which had been decided prior to the Immigration and Nationality Act. Since the court's holding represented no departure from what had existed prior to the Immigration and Nationality Act, its decision should not demand a change in the administrative practice which had been established prior to 1952. As a matter of fact, there is a vital factual difference between *Leng May Ma* and the instant case. *Leng May Ma* does not involve an alien whose parole had been terminated *to enable him to be "in" the United States. Kaplan* v. *Tod*, 267 U.S. 228 (1925), upon which the court relied, did not involve an alien whose parole had been terminated to enable him to be "in" the United States. The decision in *Leng May Ma* should no more prevent the continuance of the administrative practice than did the decision in *Kaplan*.

The Service states that it is contrary to the amended regulation to terminate parole of an alien and then handle his case in other than exclusion proceedings. We cannot agree with this interpretation. In the first place, the amendment of the regulation occurred *after* the termination of parole. In the second place, the Commissioner cannot by a regulation take from the Attorney General a power that the law gives him.[2]

---

[2] We have pointed out, Congress did not indicate that it desired to change the administrative practice which existed prior to the Immigration and Nationality Act. This is significant in view of the fact that when Congress wanted to change an administrative practice of long standing, it did so explicitly. It would not be proper to deprive the Attorney General of a power the law gives him and which he still needs. (An alien paroled after exclusion is ordered deported under the order of exclusion to the country whence he came—the only place to which an excluded alien can be deported is to the country whence he came—that country refuses to accept him—the Service needs the power to terminate parole to place the alien "in" the United States so that expulsion proceedings permitting deportation to a wide choice of countries may be utilized. (See, 8 U.S.C. 1227 and 1253, and *United States ex rel. Milanovic* v. *Murff*, 253 F.2d 941 (C.A. 2, 1958).)) Inability to place an applicant for admission in expulsion proceedings may hamper the Government in its efforts to deport undesirable aliens (see, *United States ex rel. Paetau* v. *Watkins*, 164 F.2d 457 (C.A. 2, 1947)). On the other hand, it may become

The conclusion that an excluded alien must be heard only in exclusion proceedings under all circumstances has been rejected judicially. Section 212(d)(5) of the Immigration and Nationality Act, which states that the alien "shall" be returned to the custody from which he was paroled and that he be regarded as an applicant for admission, does not require that all parolees be heard in an *exclusion* proceeding. In certain cases the Government must give an applicant for admission the hearing which is given to a *resident* alien (*Kwong Hai Chew* v. *Rogers*, 257 F.2d 606 (C.A. D.C., 1958)).

It is appropriate to note an analogy. The Immigration and Nationality Act provides that an alien against whom a warrant of arrest in expulsion proceedings has been issued may not have a hearing upon a petition for naturalization. Nevertheless, the Attorney General possesses the inherent discretionary power to terminate expulsion proceedings to permit the alien to adjust his status through naturalization (*Matter of B—*, 6—713; see also, *Matter of M—*, 5—622). The power to terminate parole in exclusion proceedings to enable an alien to adjust his status is analogous to the power to terminate deportation proceedings to enable a "deportable" alien to apply for naturalization.

We conclude, therefore, that although an alien excluded and paroled cannot as a matter of right change his status as one standing at the gates, the administrative authorities may, in their discretion, in the public interest or for compelling humanitarian reasons, terminate the parole of an alien so that he shall be "in" the United States for the purpose of availing himself for relief which may enable him to adjust his status. (The continuance of the administrative practice should not prove more difficult under the Immigration and Nationality Act than it has in the past, or than have similar practices as termination of deportation proceedings to enable one to have a hearing on a naturalization petition, or continuance of an excluded alien on parole on the ground that his deportation would result in physical persecution.)

Of course, the action of the Service in making an issue of this case is not egregious nor is the Service estopped from making the issue; however, we do feel the wisdom of raising the issue in this case is debatable. Respondent is under an order of deportation. He has been denied suspension of deportation. The order of deportation was entered after the respondent sought to reopen his exclusion case and was told that the expulsion procedure being followed was the proper one. He was told this by the Service, and by the Board without Service objection, even though he attempted to reopen the exclusion case *after* the Service had started expulsion proceedings. He

---

apparent that an alien's deportation would result in such serious consequences to United States citizens that it should be avoided by permitting the alien to apply for relief available to aliens "in" the United States.

has been put through the expense and trouble of an expulsion proceeding. He has gone through the expense and trouble of an administrative appeal. It has taken 10 years to bring the case to its present stage. Now the Service would start all over. Why? In the expulsion proceeding, the only administrative relief left is an application under section 243(h) of the Immigration and Nationality Act for a stay of deportation on the ground that he will face physical persecution. If he is now placed in exclusion proceedings and is ordered deported, he cannot file the same application but can achieve a similar result by requesting an extension of parole on the ground that he would face physical persecution. If he is granted such relief in the exclusion case, would he not have been granted a stay in the expulsion case? And, if he is denied the extension of parole in the exclusion case, can he not be denied a stay in the deportation case?

**ORDER:** Pursuant to the provisions of 8 CFR 3.1(h)(1)(iii) and at the request of the Commissioner, this case is referred to the Attorney General for review.

### BEFORE THE ATTORNEY GENERAL
(Sept. 12, 1960)

**ORDER:** It is directed that the deportation proceeding herein be terminated and that the case be returned to the Immigration and Naturalization Service for disposition in exclusion proceedings pursuant to section 235 or 236 of the Immigration and Nationality Act, with consideration being given to an extension of parole status as long as the alien is in danger of physical persecution in his native land.

This case is before me in accordance with the provisions of 8 CFR 3.1(h)(1)(iii) for review of a decision by the Board of Immigration Appeals.

The subject is a native of China who claimed to be a citizen when he applied to enter the United States on December 20, 1948. Pending determination he was paroled and when his citizenship could not be established, his parole was terminated as of the date of his 1948 entry. He was then permitted to file an application for suspension of deportation. The question at issue between the Commissioner of Immigration and Naturalization and the Board of Immigration Appeals, and the subject of this reference to me, is whether it was allowable, within the provisions of the Immigration and Nationality Act, to convert proceedings in the case from exclusion to deportation, thus permitting application for suspension of deportation following termination of the alien's parole. The Service confesses error in permitting the conversion. The Board would uphold the procedure although it finds the alien in this case unqualified for suspension of deportation.

For the purposes of this decision the parole provisions in section 212(d)(5) of the Immigration and Nationality Act are notable in two respects. While they permit the Attorney General to parole aliens applying for admission to the United States, they impose a limitation that "such parole of such alien shall not be regarded as an admission of the alien" and they require that when the purposes of the parole have been served "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." In my opinion, these provisions in section 212(d)(5) form a clear directive to the Attorney General to treat any alien paroled as "an applicant for admission to the United States" as soon as the purposes of his parole "have been served." No interval of time is provided between termination of parole and return "forthwith" to custody during which an alien could be rendered deportable for any purpose.

The Board finds no ambiguity in the language of the parole provisions but contends that Congress in enacting those provisions did not indicate an intention to change the administrative practice prevailing prior to the Immigration and Nationality Act. Under the former practice an alien could be rendered deportable upon termination of parole. If that position were supported by the history of the legislation, valuable powers would be preserved under which the Attorney General could, in his discretion, permit adjustments of status available to him in deportation but not in exclusion proceedings. Unfortunately, the history is barren of such support. Moreover, in the case of *Leng May Ma* v. *Barber*, 357 U.S. 185, decided June 16, 1958, the Supreme Court concluded that when Congress enacted the Immigration and Nationality Act it gave no evidence of an intention to depart from the traditional concept that parole is not an admission of an alien. Specifically, the Court held that section 243(h) of the Act, which authorizes the Attorney General to withhold deportation of an alien who would be subject to physical persecution in his native land, is not available to an inadmissible alien who is in the United States in a parole status. The Court ruled that the status of Leng May Ma was not changed when her parole was terminated. As long as she was an excludee, she remained on the threshold of initial entry and was not entitled to additional rights and privileges which might be extended to aliens who are within the United States after an entry, irrespective of its legality.

The *Leng May Ma* decision is a determinative interpretation in the instant case. Taken with the language of section 212(d)(5), it leaves no alternative to the conclusion that the termination of parole requires that the case be continued in exclusion proceedings. As ordered, it is therefore returned to the Immigration and Naturalization Service for that purpose.

77